## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

H.O.P.E., INC., d/b/a/ HOPE FAIR          )
HOUSING CENTER, an Illinois               )
Not-for-Profit Corporation; KIMBERLY      )
O'CONNOR; and TAMMY MORMINO;              )
                                          )
            Plaintiffs,                    )
                                          )          Case No. 13-cv-7391
                                          )
            v.                             )
                                          )          Judge Joan B. Gottschall
EDEN MANAGEMENT LLC d/b/a  EDEN           )
SUPPORTIVE LIVING; 311 LINCOLNWAY         )
PROPERTIES LLC d/b/a/ EDEN FOX VALLEY;    )
222 STATE STREET PROPERTIES LLC, d/b/a/   )
EDEN CHAMPAIGN LLC; MICHAEL               )
HAMBLET JR.; MARIA DROSOS; CARLEEN        )
CURALLI; KIMBERLYCROSS; GOVERNOR          )
PATRICK QUINN, in his official capacity;   )
JULIE HAMOS, in her official capacity as   )
Director of the Illinois Department of Healthcare )
and Family Services; THERESA EAGELSON     )
WYATT, in her official capacity as Acting  )
Medicaid Director for DHFS; KELLY          )
CUNNINGHAM, in her official capacity as Chief )
of DHFS Bureau of Long Term Care; JOHN K.  )
HOLTON, in his official capacity as Director of the )
Illinois Department of Aging; and MICHELLE )
R.B. SADDLER, in her official capacity as the )
Secretary of the Illinois Department of Human )
Services,                                  )
                                          )
            Defendants.                    )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Kimberly O'Connor and Tammy Mormino, are Medicaid recipients who

believe they are eligible for the Illinois Medicaid Waiver Supportive Living Program on the basis

of their physical disabilities. These two plaintiffs (the "Individual Plaintiffs"), on behalf of

themselves and a class, along with H.O.P.E., Inc. ("HOPE"), a private, nonprofit corporation,

bring this suit against, *inter alia*, several current and former employees of the State of Illinois (collectively, "State Defendants").[1] Plaintiffs allege that the State Defendants have unlawfully excluded individuals with mental disabilities from participating in the Supportive Living Program in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*¸ the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act, 42 U.S.C. § 794.

Now before the court are the State Defendants' motions to dismiss. For the reasons set forth herein, the motions are granted, and Plaintiffs' claims against the State Defendants (Counts IV, V, and VI) are dismissed.

## I.   BACKGROUND

### A.  The Supportive Living Program

Medicaid, enacted in 1965 as an amendment to the Social Security Act of 1935, is a joint federal-state program that provides medical assistance to low income individuals.[2] *See* 42 U.S.C. § 1396 *et seq*. Although the federal government does not require states to participate in the Medicaid program, once they do, they "must comply with federal statutes and regulations." *Bertrand v. Maram*, No. 05-cv-0544, 2006 WL 2735494, at *1-2 (N.D. Ill. Sept. 25, 2006) (citing 42 U.S.C. § 1396a(a)(10)), *aff'd sub nom. Bertrand ex rel. Bertrand v. Maram*, 495 F.3d

---

[1]      The State Defendants are comprised of former Governor Patrick J. Quinn in his official capacity as Governor of the State of Illinois, Julie Hamos, in her official capacity as Director of the Illinois Department of Healthcare and Family Services ("DHFS"), Theresa Eagleson, in her official capacity as the Director of DHFS's Division of Medical Programs, Kelly Cunningham, in her official capacity as the Chief of DFHS's Bureau of Long Term Care, Michelle R.B. Saddler, in her official capacity as the Secretary of the Illinois Department of Human Services, and John K. Holton, in his official capacity as the Director of the Illinois Department on Aging. The court notes that the First Amended Complaint does not reflect the current officeholders.

[2]      "[A]dministration [of Medicaid] is entrusted to the Secretary of Health and Human Services (HHS), who in turn exercises his authority through the Centers for Medicare and Medicaid Services (CMS)." *Arkansas Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006) (citation omitted).

452 (7th Cir. 2007); *see, e.g.,* 42 C.F.R. § 440.210, 440.220 (listing mandatory services a participating state must provide to the "categorically needy" and "medically needy").

In this case, the State Defendants' provision of mandatory services is not at issue. Rather, the Amended Complaint centers on a voluntary program, the Supportive Living Program, which the state of Illinois initiated after "apply[ing] for and receiv[ing] a waiver of Medicaid's normal rules" in order to provide "home and community-based services." *See Bertrand*, 495 F.3d at 454 (citing 42 U.S.C. § 1396n(c)(1)). Under § 1396n(c)(1), a participating state may offer services in community settings to qualified individuals who: (a) but for the provision of such services, would require a level of institutional care such as a nursing home; (b) are members of a target group that is included in the waiver; (c) meet applicable Medicaid financial eligibility criteria; (d) require one or more waiver services in order to live in the community; and (e) have the right to participate in the waiver program in lieu of receiving institutional care. *See* Am. Compl. ¶ 64.

In total, the state of Illinois operates nine separate "Home and Community-Based" waiver programs. Each program targets a different segment of the state's population. *See* http://www2.illinois.gov/hfs/MedicalPrograms/HCBS/Pages/default.aspx (last visited Aug. 2, 2015). The waivers are: Children and Young Adults with Developmental Disabilities ("DD")-Support Waiver; Children and Young adults with DD-Residential Waiver; Children that are Technology Dependent/Medically Fragile; Persons with Disabilities; Persons with Brain Injuries; Adults with Developmental Disabilities; Persons who are Elderly; Persons with HIV or AIDS; and the Supportive Living Program. *Id.*

For an applicant to qualify for the last in the foregoing list of programs, the Supportive Living Program, he or she must:

3

1) be age 22 years or over with a disability (as determined by the Social Security Administration) or elderly (age 65 years or over);

2) be screened by the DHFS or other State agency screening entity and found to be in need of nursing facility level of care and that Supportive Living Facility placement is appropriate to meet the needs of the individual;

3) be without a primary or secondary diagnosis of developmental disability or serious and persistent mental illness, as determined by a qualified Department of Human Services screening agent; and

4) have his or her name checked against government offender websites and databases.

*See* 89 Ill. Adm. Code § 146.220(a).[3]

If an individual satisfies these and other criteria, then a Supportive Living Facility

("SLF") may admit or retain that individual as a resident. An SLF is

> a residential setting in Illinois that provides or coordinates flexible personal care services, 24 hour supervision and assistance (scheduled and unscheduled), activities, and health related services with a service program and physical environment designed to minimize the need for residents to move within or from the setting to accommodate changing needs and preferences; has an organizational mission, service programs and a physical environment designed to maximize residents' dignity, autonomy, privacy and independence; and encourages family and community involvement.

*See* 89 Ill. Admin. Code § 146.200.

## B. The Individual Plaintiffs

### 1. *O'Connor*

O'Connor is a recipient of Social Security disability payments. Her physical disabilities range from a severe heart condition and ruptured discs to diabetes, neuropathy, and recurring bleeding ulcers. These conditions affect her mobility, equilibrium, and physical endurance. O'Connor also suffers from mental health disabilities, including a "longstanding

---

[3]     DHFS tendered these criteria as parts of its waiver application to CMS and incorporated the criteria into the state regulations that govern Supportive Living Facilities. *See* http://www2.illinois.gov/hfs/MedicalPrograms/HCBS/Documents/waiver0326.pdf at 22-23 (last visited Aug. 18, 2015).

4

disorder," which, without medical treatment, interferes with her "work, housekeeping, personal care, and relationships." Am. Compl. ¶ 113.

In October 2012, O'Connor was hospitalized. Before she was discharged, the hospital's discharge planner provided O'Connor with information regarding SLFs. O'Connor thereafter called the Fox Valley location of defendant Eden Supportive Living ("Eden"), an SLF regulated by DHFS. Eden provides apartment-style housing and health-related services to those who are elderly (over age 65) and persons with physical disabilities age 22 and older.

During the call, the Eden representative asked O'Connor several health-related questions. O'Connor informed the representative that she had heart problems, diabetes, and a mental health diagnosis not specifically described in the Amended Complaint. The representative responded that Eden did not accept residents with her mental health diagnosis and hung up the phone.

In November 2012, O'Connor was readmitted to the hospital and again contacted Eden upon being discharged. This time, she spoke to a different representative about becoming a resident. O'Connor informed the representative that she had heart disease and diabetes, but she did not disclose her mental health diagnosis. The Eden representative stated that O'Connor could view the facility after she was prescreened by a nearby location of the Division of Rehabilitation Services ("DRS").

O'Connor called the DRS location and spoke to two different employees. She informed them that Eden had referred her for prescreening, but neither employee was familiar with the screening process for the Supportive Living Program. O'Connor then called Eden and left a voicemail indicating that she was unable to schedule the screening. An Eden representative

returned her call to inform her that Eden had scheduled a "Determination of Needs" prescreening with DRS for her on December 6, 2012.

On December 4, 2012, however, O'Connor called Eden to inquire "if it would be a problem if she had her particular mental health diagnosis." *Id*. ¶ 126. The Eden representative told her that Eden would not accept her "if she had *any* mental health diagnosis, including, for example, a diagnosis of depression." *Id.* ¶ 127 (emphasis in original).

As a result of this "rejection by Eden," O'Connor became homeless. *Id.* ¶ 130. O'Connor alleges that she "requires no additional supportive services from Eden as a result of her mental health diagnosis." *Id*. ¶ 128.

### 2.Mormino

Mormino is also a recipient of Social Security disability benefits. Her physical disabilities include chronic obstructive pulmonary disease, hypertension, hypothyroidism, GERD, obstructive sleep apnea, neuropathy, arthropathy, and diabetes. These disabilities impair Mormino's performance of daily living activities, such as walking, grocery shopping, meal preparation, and cleaning. She uses assistive devices for mobility.

In 2005, Mormino applied to reside in an Eden SLF based on her physical impairments. After Eden accepted her application, Mormino moved into an Eden facility. She received assistance with nutrition, meals preparation, housekeeping, medication reminders, and laundry while she was an Eden resident.

In 2008, Mormino "was considered for transfer" from Eden to a nursing facility and "was referred" to DHFS for a Level II Preadmission Mental Health Screening.[4] The screening

---

[4]      Plaintiffs repeatedly use the passive voice throughout their allegations, thereby obscuring who took the actions at issue. The court quotes a few examples to highlight the uncertainty that they create. In paragraph 140 of the Amended Complaint, for instance, the court cannot tell who

resulted in a determination that she needed Nursing Facility Level of Care "based on her mental health needs *at that time*." *Id.* ¶ 140 (emphasis in original). Mormino thereafter moved into a nursing facility, where she has resided since 2008.

In 2013, Mormino's physician determined that she had made substantial progress in her mental health condition. The physician concluded that Mormino's medical issues superseded her psychiatric issues. Mormino "was informed" that she once again should apply to reside at an Eden SLF. *Id.* ¶ 141.

Mormino contacted Eden in September 2013, visited the facility in October 2013, and completed an application for residency. As part of her application, she furnished Eden with her doctor's verification that her medical issues "predominate over her psychiatric issues." *Id.* ¶ 142. On November 20, 2013, Eden wrote to Mormino stating that "one of the resident requirements for the supportive living program is that the individual be without a primary or secondary diagnosis of developmental disability or serious and persistent mental illness." *Id.* ¶143. Eden also told Mormino that she needed a new mental health screening.

Mormino, however, subsequently learned from the State of Illinois that she did not need another screening and that her prior screening from her transfer in 2008 was sufficient.[5] Nevertheless, Eden informed Mormino that it could not accept her for residency unless she provided results from an updated screening. Mormino followed up in November 2013 by sending Eden three written complaints, asserting that Eden's refusal to admit her was discriminatory because Eden "fail[ed] to take any steps to cause an updated screening to be completed, particularly in light of the Ill. Administrative Code requirement that the Division of

considered Mormino for a transfer from an Eden SLF to a nursing facility or what prompted that consideration. Similar confusion inheres in other passively pled allegations.

[5] *See* 89 Ill. Adm. Code 146.220(a)(2) ("A new screen is not needed for a resident who is transferring between SLFs or comes from a nursing facility with no break in service.").

Mental Health must screen SLF applicants concerning mental illness." *Id.* ¶ 146. Mormino alleges that she needs no additional supportive services from Eden as a result of her mental health diagnosis. *Id.* ¶ 148.

### 3. HOPE

HOPE is an organization dedicated to eliminating discrimination and segregation in housing. Both O'Connor and Mormino learned about HOPE after failing to obtain housing with an Eden SLF. O'Connor discovered HOPE in a news article as she searched the classifieds for housing; Mormino came across HOPE while researching housing discrimination on the Internet. Both O'Connor and Mormino contacted HOPE and inquired whether it would investigate Eden's denial of their applications.

After receiving O'Connor's complaint, HOPE initiated an investigation into the Eden Defendants' processing of applicants. The investigation entailed submitting fake applications for residency through "testers," individuals posing as potential SLF applicants, and tracking the responses of the Eden Defendants.[6] In an application or conversation with an Eden representative, the tester would disclose that he or she possessed both a physical disability and a mental illness. On every occasion, the Eden representative allegedly responded that Eden would not accept an applicant who had a diagnosis of mental illness.

### 4. Class Allegations

The Individual Plaintiffs seek to represent a class of "all persons in the State of Illinois who have been improperly deterred, excluded, or rejected from SLF housing and services based on [a] mental health diagnosis." Am. Compl. ¶ 187. Importantly, all of the claims and issues the Individual Plaintiffs identify as common to the class run to the State of Illinois, its policies, and

---

[6] HOPE conducted a similar investigation into non-parties, Tabor Hills Supportive Living, Eastgate Manor, and Courtyard Estates Peoria. *See* Compl. ¶¶ 171-177.

the State Defendants. None of the class claims are directed at the Eden Defendants or any other Supportive Living Facility.

The Individual Plaintiffs allege that a class action would be superior to litigation of the Individual Plaintiffs' claims because the court can adjudicate, among other issues: (1) whether the Illinois Supportive Living Program—which CMS approved as an amendment to the Medicaid Home and Community-Based Services waiver program—is unlawful because it excludes persons with "a primary or secondary diagnosis of a . . . serious and persistent mental illness," Compl. Ex. 2 at 23; and (2) whether the State Defendants have improperly administered the Supportive Living Program by, *inter alia*, excluding applicants "believed to have 'severe' mental illness," regardless of whether an applicant "is nonetheless suitable to live" in a Supportive Living Facility because that person is on medication, "does not pose a threat to self or others, and has a good rental or residential history." Am. Compl. ¶¶ 88-89.

## II. DISCUSSION

The State Defendants move to dismiss Counts IV, V, and VI of the Amended Complaint pursuant to Rule 12(b)(1) for lack of standing and pursuant to Rule 12(b)(6) for failure to state a claim. The court first turns to the State Defendants' challenge to Plaintiffs' standing under Rule 12(b)(1).

### A. Rule 12(b)(1)

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a court must dismiss a claim if it lacks subject-matter jurisdiction over it. *Illinois v. City of Chicago*, 137 F.3d 474, 478 (7th Cir. 1998) ("Subject-matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction it must proceed no further."). When deciding a motion to dismiss pursuant to Rule 12(b)(1), the court accepts "as true all facts alleged in the well-

pleaded complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012). The court, however, "may look beyond the pleadings if necessary to determine whether subject-matter jurisdiction exists." *Revelis v. Napolitano*, 844 F. Supp. 2d 915, 919 (N.D. Ill. 2012) (citing *Hay v. Ind. State Bd. of Tax Commis.,* 312 F.3d 876, 879 (7th Cir.2002)).

In this case, the State Defendants assert that the court lacks subject matter jurisdiction to hear Counts IV, V, and VI of the Amended Complaint because Plaintiffs lack standing to bring these claims. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III" of the United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "As a jurisdictional requirement, the plaintiff bears the burden of establishing standing." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). To meet the minimum standing requirements of Article III, a plaintiff must prove three elements: (1) he or she suffered a concrete and particularized injury that is actual or imminent; (2) the injury is fairly traceable to the defendant's action; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.

For clarity in analysis, the court addresses the Individual Plaintiffs' standing and HOPE's standing separately, in that order, just as the parties have done in briefing the State Defendants' motions to dismiss.

### 1.The Individual Plaintiffs

The State Defendants argue that the Individual Plaintiffs' claims must be dismissed because there is no causal "link" between the State Defendants and the Individual Plaintiffs' alleged injuries. "To meet the 'causation' requirement for standing, [a plaintiff] and must show that [his or her] injury is fairly traceable to action taken by the [defendant]." *P.G. by & through*

*K.G. v. Hamos*, No. 13-cv-3020, 2014 WL 274130, at *5 (C.D. Ill. Jan. 24, 2014) (citing *Bennett v. Spear,* 520 U.S. 154, 168 (1997)).

The gravamen of the Individual Plaintiffs' claims against the State Defendants is that the State Defendants established and continue to maintain the Supportive Living Program, which is facially discriminatory because it "exclude[s] individuals otherwise qualified who have mental health diagnoses." Am. Compl. ¶ 24. As a result of this policy of exclusion, the Individual Plaintiffs allege, SLF applicants with mental illness are "in most cases left in a more restrictive, segregated, or underserved setting." *Id.* ¶ 87.

However, the alleged link between the Individual Plaintiffs' actual injuries and any conduct by the State Defendants, if such a link exists, is inadequately pled. The Individual Plaintiffs do not allege that the State Defendants diagnosed them with a "severe and persistent mental illness," disqualified them from the Supportive Living Program, or denied them any kind of state-provided service. In fact, the Individual Plaintiffs acknowledge in their opposition briefs that they have not submitted to mental health screening with the State. Unless the Individual Plaintiffs do so and receive diagnoses that preclude them from participating in the Supportive Living Program, the court has no basis to infer that the State Defendants injured them. *See Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 821 (7th Cir. 2014) ("The plaintiffs here argue that they have standing because they were denied a benefit (a tax exemption for their employer-provided housing allowance) that is conditioned on religious affiliation. This argument fails, however, for a simple reason: the plaintiffs were never *denied* the parsonage exemption because they never asked for it. Without a request, there can be no denial. And absent any personal denial of a benefit, the plaintiffs' claim amounts to nothing more than a generalized

11

grievance about § 107(2)'s unconstitutionality, which does not support standing.") (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573-74 (1992) (footnotes omitted)).

In fact, the allegations of the Amended Complaint plainly indicate that the Eden Defendants, not the State Defendants, caused the Individual Plaintiffs' respective harms. Both Individual Plaintiffs allege that they called an Eden SLF, spoke with an Eden representative, and disclosed that they had a mental health diagnosis. In O'Connor's case, the Eden representative stated that Eden "could not accept her if she had *any* diagnosis of mental illness. . . ." Am. Compl. ¶ 127. Accepting this allegation as true, it shows that the Eden SLF disregarded 89 Ill. Adm. Code 146.220(a)(3). This regulation provides:

> a) The SLF may admit or retain residents whose needs can be met through the services described in Section 146.230. The following criteria shall be met prior to admission to the SLF . . . 3) Be without a primary or secondary diagnosis of developmental disability or serious and persistent mental illness. *The developmental disability or mental illness must be determined by a qualified Department of Human Services screening agent . . . .*

Evident in the italicized language above, Section 146.220(a)(3) expressly requires an SLF to defer to the Department of Human Services for any determination of an applicant's mental illness. And, the regulation permits exclusion of an applicant only if that individual has received a "primary or secondary diagnosis of developmental disability or *serious and persistent* mental illness." *Id.* (emphasis added). The Eden Defendants allegedly violated both of these regulatory restrictions by rejecting applicants who disclosed a prior history or diagnosis of mental illness, regardless of its severity or who diagnosed it, without directing them to the Department of Human Services for screening.

Mormino's alleged injury likewise stem from her dealing with an Eden SLF. The Amended Complaint indicates that an Eden representative informed Mormino that her prior mental health screening was outdated and needed to be renewed before Eden would process her

application.  Notably, the Amended Complaint recounts a subsequent conversation that Mormino had with "[t]he State of Illinois," in which a State representative informed Mormino that "she did not need another screen and that her prior screen from [her] transfer [from an Eden SLF to a nursing home] in 2008 was sufficient."  *Id.* ¶ 144 (citing 89 Ill. Adm. Code 146.220(a)(2) ("A new screen is not needed for a resident who is transferring between SLFs or comes from a nursing facility with no break in service."))  Even though Plaintiffs agree with the State's interpretation of when a new screen is necessary, they somehow attribute Mormino's continued hospitalization in a nursing home to the State Defendants.  If anything, the allegations in the Amended Complaint show that the Eden Defendants disregarded the applicable state regulation, Section 146.220(a)(2).  These allegations do not connect Mormino's continued residency in a nursing home to any conduct by the State Defendants.

Attempting to demonstrate causation, the Individual Plaintiffs argue that they should not have to undergoing the mandatory mental health screening to trace their injuries to the State, since "state screenings for applicants with mental health diagnos[e]s like the plaintiffs would ultimately be futile."  (Pls.' Opp. Br. at 9.)  In other words, the Individual Plaintiffs predicate their claims against the State Defendants on the assumption that the State will inevitably give them mental health diagnoses that will disqualify them from living in a Supportive Living Facility.

The allegations in the Amended Complaint, however, belie the inevitability of such diagnoses.  As the State Defendants note, having "a history of mental illness" is not the same as having a "serious and persistent" mental illness.  An applicant could have the latter but not the former and thus be eligible for residency in a Supportive Living Facility.  According to the Contractor's Procedure Manual for the Illinois Department of Human Services, Department of

13

Mental Health, a "severe mental illness" is determined by an assessment of seven areas, including "self-maintenance" and "social functioning," to see whether a Supportive Living Facility can meet the applicants' needs.[7]  In this case, both Individual Plaintiffs allege that they do not require any "additional supportive services" as a result of their mental health diagnoses; they further allege that their mental health diagnoses do not "affect [their] ability to meet or perform any [Supportive Living Program] or residency requirements."  *See* Am. Compl. ¶¶ 128-129, 148-149.  The Amended Complaint's allegations thus are consistent with the possibility that the Individual Plaintiffs will pass the State's mental health screening, if they submit to it.[8]

Until the Individual Plaintiffs complete the requisite mental screening, it is impossible to know what their diagnosis might be and how that diagnosis could affect their eligibility for the Supportive Living Program.  Only if the Individual Plaintiffs submit to the mandatory screening and receive a diagnosis that injures them in some way will they have suffered legal injury at the hands of the State Defendants.

Finally, the Individual Plaintiffs argue that, although they have not undergone mental health screening with the State and received a State-issued diagnosis of mental illness, the State Defendants are nevertheless responsible for their injuries because they failed to "inform, train,

---

[7]     As an exhibit to the complaint, the court may consider the Contractor's Manual in evaluating the State Defendants' motions to dismiss. *See Fiala v. Wasco Sanitary Dist.*, No. 10 C 2895, 2012 WL 917851, at *1 (N.D. Ill. Mar. 16, 2012) (exhibits to the complaint are "pertinent at the Rule 12(b) stage") (citing  *Witzke v. Femal,* 376 F.3d 744, 749 (7th Cir.2004).

[8]     These allegations also show that the Individual Plaintiffs' claims against the State Defendants arise not from the Supportive Living Program itself, but from the Eden Defendants' alleged enactment of "no mental illness" policies.  If the Individual Plaintiffs underwent the mental health screening with the State and passed, then the exclusion of those with "a primary or secondary diagnosis of developmental disability or serious and persistent mental illness" would not apply to them.  In this scenario, the only way the Individual Plaintiffs would remain institutionalized (Mormino) or homeless (O'Connor) would be if Eden continued to ignore the regulatory scheme that applies to Supportive Living Facilities by rejecting them for having *any* diagnosis of mental illness pursuant to its "no mental illness" policy.

monitor, or guide SLFs . . . with regards to non-discrimination concerning mental health issues, proper assessment, proper documentation, or due process considerations." Am. Compl. ¶ 89(n). But not only is this allegation inadequately pled, as it consists of a vague, blanket accusation of involvement by the State Defendants in the Eden Defendants' and other SLFs' affairs. The allegation also fails because it presupposes that the State Defendants can be held liable for the actions of private entities, the Eden Defendants.

To hold the State Defendants accountable for Eden's "no mental illness" policy, the Individual Plaintiffs must allege that the State Defendants "exercised coercive power or [ ] provided such significant encouragement, either overt or covert, that [Eden's policy] must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (holding a state's adjustment of Medicaid benefits in response to a private nursing home's patient discharge and transfer decisions does not "render [the state] *responsible* for [the nursing home's] actions"). Here, nothing in the Amended Complaint suggests that the State Defendants encouraged, let alone knew of, the Eden Defendants' creation of a "no mental illness" policy.[9] Because the Individual Plaintiffs fail to allege a connection between their injuries and the State Defendants, the Individuals Plaintiffs' claims against the State Defendants are dismissed.[10]

---

[9] And, even if the Individual Plaintiffs had alleged that the State Defendants approved of Eden's policy, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum*, 457 U.S. at 1005.

[10] An issue that none of the parties briefed is whether the court should consider the Individual Plaintiffs' lack of standing at the outset of this case on a motion to dismiss or at the class certification stage. The Seventh Circuit has noted that the "question of 'standing' is just one part of a rather complex network of rules regulating class actions, under which the named plaintiff is the critical actor for some purposes, every individual member of the class is relevant for other purposes, and the class as a whole is the focal point for yet other purposes." *Payton v. Cnty. of Kane*, 308 F.3d 673, 681 (7th Cir. 2002). For instance, "[i]f the defendants with whom [a] named representative did not interact directly are following a common statute (and this common factor assures that the representative has the same legal claim as the unnamed parties . .

## 2.HOPE

"All plaintiffs, including organizations, seeking to invoke federal jurisdiction must have

standing." *Freedom from Religion Found., Inc. v.* Nicholson, 536 F.3d 730, 737 (7th Cir. 2008).

"An organization may have standing in its own right, or as [a] representative of its members."

*Access Living of Metro. Chi. v. Chi. Transit Auth.*, No. 00-cv-0770, 2001 U.S. Dist. LEXIS 6041,

at *12 (N.D. Ill. May 9, 2001).

Here, HOPE asserts organizational standing only.[11]  For HOPE to establish

organizational standing, it must show that it suffered an "actual or threatened injury in fact that is

fairly traceable to the alleged illegal action and likely to be redressed by a favorable court

decision." *See Equal Rights Ctr. v. Post Properties, Inc.,* 633 F.3d 1136, 1138 (D.C. Cir. 2011)

(quoting *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27 (D.C. Cir. 1990) (citing *Havens Realty*

*Corp. v. Coleman,* 455 U.S. 363, 372 (1982)).  "To accomplish this, [HOPE] must point to a

'concrete and demonstrable injury to [its] activities'; a mere 'setback' to its 'abstract social

---

. ), [there is] nothing in either standing doctrine or Rule 23 that automatically precludes use of the class action device." *Id.* at 681-82.

On the other hand, a named plaintiff may not "try[] to piggy-back on the injuries of the unnamed class members." *Id.* at 682.  "That, of course, would be impermissible, in light of the fact that 'a named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action.'" *Id.* (quoting *Allee v. Medrano,* 416 U.S. 802, 828–29 (1974) (Burger, C.J., dissenting)).

[11]      HOPE does not assert that it has standing as a representative of its members, a theory of standing known as "representational standing" or "associational standing."  *See  Greater Indianapolis Chapter of the NAACP v. Ballard,* 741 F. Supp. 2d 925, 931 (S.D. Ind. 2010) ("An organization has associational standing to sue on behalf of its members only if it satisfies each of three requirements, known as the *Hunt* requirements, derived from the Supreme Court's decision in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977): (1) the organization's members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claims nor the requested relief requires the participation of individual members in the lawsuit.").

interests' is not sufficient." *Id.*  In the Seventh Circuit, however, "the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against [the defendant's] discrimination," for such resources are the "opportunity costs of discrimination . . . ." *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990).

HOPE pins its organizational standing on the allegation that "the State Defendants' conduct resulted in a diversion of [ ] HOPE's resources . . . ."  Pls.' Opp. Br. at 11 (citing Am. Compl. ¶¶ 218, 220).   As supporting authority, HOPE cites *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)), for the proposition that an organization suffers an injury in fact if the "defendant's discrimination impaired [the] organization's ability to provide counseling and such impairment diverted the organization's resources." Pls.' Opp. Br. at 10 (citing *Havens*, 455 U.S. at 379).

HOPE's reliance on *Havens*, however, is misplaced because the organization's expenditure of resources in *Havens* was traceable to the defendant's conduct.  The *Havens* complaint centered on allegations that the defendant, Havens Realty Corp., steered black apartment hunters away from two apartment complexes that it owned and operated.  *Id.* at 366-69.  One of the plaintiffs, Housing Opportunities Made Equal ("HOME"), alleged that the defendant's steering practices "had frustrated [HOME's] counseling and referral services, with a consequent drain on resources."  *Id.* at 369.  The Court framed the issue of organizational standing as "the same inquiry as in the case of an individual: Has the plaintiff 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction'?"  *Id.* (citing *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261 (1977)). The Court found that HOME met this bar by alleging that the defendant's "steering

17

practices [ ] perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers . . . with the consequent drain on the organization's resources. . . .' *Id.* at 379.

*Havens* is distinguishable from this case because, unlike HOME, HOPE cannot trace any deflection of its resources to discrimination by the State Defendants. In the Amended Complaint, HOPE alleges that it "engaged in advocacy and investigation of the State Defendants' conduct towards Ms. O'Connor and Ms. Mormino and of the State's policies and procedures under the Fair Housing Act." Am. Compl. ¶ 218. But HOPE sheds no light on what the State Defendants' "conduct" was, and the other allegations in the Amended Complaint indicate that neither HOPE nor the Individual Plaintiffs ever engaged with the State Defendants. Indeed, the Individual Plaintiffs allege that they spoke only with the Eden SLFs, whose representatives stated that Eden would not accept the Individual Plaintiffs' applications because they either had prior diagnoses of mental illness or needed new screening. The Individual Plaintiffs thereafter "contacted HOPE for investigation into *Defendants'* discriminatory conduct." *Id.* ¶¶ 130, 150 (emphasis added). Although this allegation lumps the Eden Defendants and the State Defendants together, a subsequent allegation shows that O'Connor's complaint to HOPE gave rise to HOPE's investigation into the Eden SLF that denied her application—not into the State Defendants: In Paragraph 153, Plaintiffs allege, "As a result of complaints concerning Plaintiff O'Connor and as part of a detailed investigation on the part of HOPE that ensued on her behalf," HOPE used a tester in January 2013 to call *the Eden location* that O'Connor had contacted. *Id.* ¶ 153. HOPE's tester left a message for an Eden representative, who later returned the call and verified that Eden had a "no mental illness"

policy.  HOPE subsequently used additional testers in August 2013 and November 2013 to call *other SLFs* to probe whether they, too, had "no mental illness" policies.

Although HOPE may have diverted resources as an "opportunity cost" of the Eden Defendants' alleged discrimination, the Amended Complaint does not show how the State Defendants caused HOPE any injury.  The Amended Complaint makes clear that HOPE initiated its investigation *into the Eden SLFs* after receiving O'Connor's complaint.  *Id.* ¶ 127.  There is no allegation that O'Connor ever complained of mistreatment by the State, presumably because she never underwent a mental health screening with the State.  Similarly, Mormino does not allege that she received a diagnosis from a qualified State representative which caused her injuries in this case.

The failure of the Individual Plaintiffs to trace their injuries to the State Defendants places HOPE in a bind.  HOPE bases its standing on the resources it spent advocating on the Individual Plaintiffs' behalf.  The Individual Plaintiffs, however, never allege that they suffered a housing deprivation or discrimination as a result of a state-issued diagnosis.  It certainly would be curious if the court found HOPE demonstrated injury in fact for "engag[ing] in advocacy and investigation of the State Defendants' conduct towards [ ] O'Connor and [ ] Mormino," while simultaneously finding that O'Connor and Mormino themselves fail to identify any State conduct that harmed them.  Such a conclusion would be inconsistent, as HOPE would be asserting standing for spending time and money investigating conduct that is detached from the discrimination the Individual Plaintiffs allegedly actually experienced.  *See Dwivedi*, 895 F.2d at 1526  (conferring standing on a housing organization that diverts resources as an "opportunity cost" of the defendant's discrimination).

Thus, despite the relatively low bar for a housing organization to establish standing, the court concludes that HOPE has failed to allege an injury that is fairly traceable to the State Defendants and dismisses its claim against them. *See Allen v. Wright*, 468 U.S. 737 , 756 (1984) (affirming dismissal of complaint contesting IRS tax-exemption "because the injury alleged is not fairly traceable to the Government conduct respondents challenge as unlawful"); *see also Campbell v. City of Berwyn*, 815 F. Supp. 1138, 1144-45 (N.D. Ill. 1993) (finding that a housing organization "failed to adequately establish that it ha[d] standing to sue under the Fair Housing Act," "even under th[e] low standard" set forth in *Dwivedi*, because the complaint contained no allegations of "specific activities that demonstrate the requisite nexus to [the] defendant['s] actions") (Williams, J.); *Williams v. Adams*, 625 F. Supp. 256, 261 (N.D. Ill. 1985) ("The problem here is that nowhere in the complaint has Hope articulated how it or any of its members have been harmed by the defendants' actions.") (granting defendants' motion to dismiss HOPE for failure to plead standing) (Aspen, J.).

**B. Rule 12(b)(6)**

As explained above, the court lacks subject matter jurisdiction over Counts IV, V and VI of the Amended Complaint; it is therefore unnecessary for the court to determine whether Plaintiffs have stated claims under the ADA, FHA, and the Rehabilitation Act against the State Defendants pursuant to Rule 12(b)(6).

## CONCLUSION

For the foregoing reasons, the State Defendants' motions to dismiss are granted, and Counts IV, V, and VI of the Amended Complaint are dismissed. This case is set for status on September 30, 2015 at 9:30 a.m.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   September 3, 2015