IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| H.O.P.E., INC. d/b/a HOPE FAIR HOUSING CENTER, an Illinois Not-for-Profit Corporation, | ) ) ) | Case Nos. 13-CV-7391 |
| | ) | 15-CV-9715 |
| Plaintiff, | ) | 15-CV-9717 |
| | ) | 15-CV-9719 |
| v. | ) | |
| | ) | The Honorable Joan B. Gottschall |
| EDEN MANAGEMENT LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

These four related cases stem from *H.O.P.E., Inc. v. Eden Management, LLC et al.*, No. 13-CV-7391.[1] In each case, H.O.P.E., Inc. ("HOPE"), a private, not-for-profit corporation, and in some cases one or more individual plaintiffs bring claims against, among others, various current and former Illinois officials (collectively "State Defendants"). Each case also involves a different group of nonstate defendants which allegedly operates a different Supportive Living Facility ("SLF") in Illinois. Plaintiffs generally allege the State Defendants and the SLF operators have unlawfully excluded individuals with mental disabilities from participating in the Supportive Living Program ("SLP") in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and the Rehabilitation Act, 42 U.S.C. § 794.

The State Defendants have filed motions to dismiss the FHA, ADA, and Rehabilitation Act claims pleaded against them in the complaint in each case, and the parties, by agreement, presented those motions in consolidated briefing. The State Defendants have also filed a motion

---

[1] Unless otherwise indicated, all ECF citations are to the court's electronic case file system in this case, *H.O.P.E., Inc. v. Eden Management, LLC et al.*, No. 13-CV-7391.

to dismiss a crossclaim for declaratory relief brought against them by the SLF defendants in one of these cases. For the following reasons, the court denies the State Defendants' motions to dismiss the plaintiffs' FHA, ADA, and Rehabilitation Act claims and grants their motion to dismiss the crossclaim.

## I. REGULATORY BACKGROUND

### A. The Supportive Living Program

The court described the pertinent statutory and regulatory background in its opinion in *H.O.P.E., Inc. v. Eden Management, LLC* ("*HOPE I*"), 128 F. Supp. 3d 1066, 1069–70 (N.D. Ill. 2015). The court repeats that background here with minor updates to provide context.

Medicaid, enacted in 1965 as an amendment to the Social Security Act of 1935, is a joint federal-state program that provides medical assistance to low income individuals.[2] *See* 42 U.S.C. § 1396 *et seq*. Although the federal government does not require states to participate in the Medicaid program, once they do, they "must comply with federal statutes and regulations." *Bertrand v. Maram*, No. 05-CV-0544, 2006 WL 2735494, at *1 (N.D. Ill. Sept. 25, 2006) (citing 42 U.S.C. § 1396a(a)(10)), *aff'd sub nom. Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452 (7th Cir. 2007); *see, e.g.*, 42 C.F.R. §§ 440.210, 440.220 (listing mandatory services a participating state must provide to the "categorically needy" and "medically needy").

The provision of mandatory services is not at issue here. Rather, these cases center on a voluntary program, the Supportive Living Program, which the State of Illinois initiated after "apply[ing] for and receiv[ing] a waiver of Medicaid's normal rules" in order to provide "home and community-based services" ("HCBS"). *See Bertrand*, 495 F.3d at 454 (citing 42 U.S.C. § 1396n(c)(1)). Under § 1396n(c)(1), a participating state may offer services in community

---

[2] "[A]dministration [of Medicaid] is entrusted to the Secretary of Health and Human Services (HHS), who in turn exercises his authority through the Centers for Medicare and Medicaid Services (CMS)." *Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006) (citation omitted).

settings to qualified individuals who: (a) but for the provision of such services, would require a level of institutional care such as a nursing home; (b) are members of a target group that is included in the waiver; (c) meet applicable Medicaid financial eligibility criteria; (d) require one or more waiver services in order to live in the community; and (e) have the right to participate in the waiver program in lieu of receiving institutional care.

The State of Illinois operates nine separate "Home and Community Based" waiver programs. Each program targets a different segment of the state's population. *See* https://www.illinois.gov/hfs/medicalclients/hcbs/Pages/default.aspx (last visited Sept. 11, 2017). The waivers are: Children and Young Adults with Developmental Disabilities-Support Waiver; Children and Young Adults with Developmental Disabilities-Residential Waiver; People who are Medically Fragile, Technology Dependent; Persons with Disabilities; Persons with Brain Injuries; Adults with Developmental Disabilities; Persons who are Elderly; Persons with HIV or AIDS; and Supportive Living Facilities. *Id.*

For an applicant to qualify for the last in the foregoing list of programs, the Supportive Living Facilities program, he or she must:

1) Be age 22 years or over with a disability (as determined by the Social Security Administration) or elderly (age 65 years or over); and

2) Be screened by the Department [of Healthcare and Family Services ("DHFS")] or other State agency screening entity and found to be in need of nursing facility level of care and that Supportive Living Facility placement is appropriate to meet the needs of the individual . . . .; and

3) Be without a primary or secondary diagnosis of developmental disability or serious and persistent mental illness, as determined by a qualified Department of Human Services screening agent; and

4) have [his or her] name checked against [government offender websites and databases].

*See* Ill. Adm. Code tit. 89 § 146.220(a).[3]

If an individual satisfies these and other criteria, then an SLF may admit or retain that individual as a resident.[4]

> An SLF is a residential setting in Illinois that provides or coordinates flexible personal care services, twenty-four hour supervision and assistance (scheduled and unscheduled), activities, and health related services with a service program and physical environment designed to minimize the need for residents to move within or from the setting to accommodate changing needs and preferences; has an organizational mission, service programs and a physical environment designed to maximize residents' dignity, autonomy, privacy and independence; and encourages family and community involvement.

*See* Ill. Admin. Code tit. 89 § 146.200.

## B. Procedural History

HOPE and Kimberly O'Connor filed the first of these cases in 2013. *H.O.P.E., Inc., et al. v. Eden Mgmt., LLC et al.*, No. 13-CV-7391. O'Connor alleged in her complaint, and these allegations remain in the Second Amended Complaint ("SAC"), that the Eden Management Defendants categorically rejected her from one of their Supportive Living Facilities when she

---

[3] DHFS tendered these criteria as parts of its waiver application to CMS and incorporated the criteria into the state regulations that govern Supportive Living Facilities. *See* Current Waiver, https://www.illinois.gov/hfs/SiteCollectionDocuments/SLPwaiver.pdf at 29 (last visited Sept. 11, 2017).

[4] On January 26, 2017, the State of Illinois published for public comment a proposed SLP waiver renewal application. Status Report 2–3, ECF No. 245 (N.D. Ill. May 5, 2017). The application for renewal proposes to make the following change to the targeting criteria:

> Potential Supportive Living Program (SLP) waiver participants must also be screened and meet nursing facility level of care. The SLP does not exclude specific diagnoses, as long as the eligibility requirements are met and the person is appropriate for placement with the SLP provider. The State will use PASRR [Pre-Admission Screening/Resident Review] to assess for persistent risks and needs to inform whether the person is appropriate for placement with the SLP provider.

*Id.* (quoting Application at 23, No. 13-CV-7391, ECF No. 245-1), available in full at https://www.illinois.gov/hfs/SiteCollectionDocuments/SLP0326Draft.pdf (last visited Sept. 11, 2017). The record does not disclose whether the application for renewal has been approved.

Plaintiffs and the state defendants expressed agreement that this proposed change is not likely to moot these cases at a hearing held May 12, 2017. The record includes no evidence showing that the application for renewal has been approved, and the State of Illinois' website lists the application as pending. *See* https://www.illinois.gov/hfs/medicalclients/hcbs/Pages/default.aspx (last visited Sept. 11, 2017). As the court has no reason to think the application has been approved or any change has been made to the Supportive Living Program to conform it to the renewal application, the court intimates no view on what, if any, effect approval would have on these cases.

disclosed that she had been diagnosed with a mental illness.  She claimed that Eden Management had a de facto 'no mental illness' policy.  Among other things, she sought injunctive relief requiring the State Defendants to modify their administrative rules regarding the SLP and also to modify Illinois' Home and Community Based Services Waiver.  O'Connor passed away in August 2016.  Resp. to State Defs.' Mot. to Dismiss 8 n.4, ECF No. 229.  She was dismissed as a named plaintiff in February 2017.  Minute Entry, Feb. 2, 2017, ECF No. 235.

The First Amended Complaint ("FAC") filed September 3, 2014, added Tammy Mormino as a plaintiff.  Like O'Connor, Mormino alleges that she was rejected by one of the Eden Management Defendants' Supportive Living Facilities because she disclosed that she had been diagnosed with a mental illness.  The FAC also expanded the relief sought against the State Defendants.

The Eden Management Defendants answered the FAC, but the State Defendants moved to dismiss it for lack of subject matter jurisdiction and failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(1) and (6).  This court granted their motion in part in September 2015, concluding that the FAC failed to demonstrate a fairly traceable connection between the State Defendants' alleged conduct and the plaintiffs' alleged injuries to give them standing to sue the State Defendants. *H.O.P.E., Inc. v. Eden Mgmt. LLC* ("*HOPE I*"), 128 F. Supp. 3d 1066 (N.D. Ill. 2015).

After conducting state-wide testing of other SLFs, HOPE filed three more cases in this court on October 30, 2015.  *H.O.P.E. Inc. v. Tabor Hills, et al.*, No. 15-CV-9719; *H.O.P.E. Inc. v. Alden Gardens, et al.*, No. 15-CV-9715; *H.O.P.E, Inc. v. Eastgate Manor, et al.*, No. 15-CV-9717.  Based on its testing, it alleges that three additional SLFs unlawfully discriminated against fictitious persons with mental health disabilities and diagnoses on whose behalf testers inquired about obtaining housing and services under the SLP.  Unlike the Eden Management case, the

complaint in each names HOPE as the sole plaintiff; HOPE sues the same State Defendants in each case but a different group of SLF defendants. Each complaint seeks similar relief and brings similar claims under the FHA, ADA, and Rehabilitation Act.

The plaintiffs in the Eden Management case also moved for leave to file a SAC.[5] While that motion was pending, they reached a settlement with the Eden Management Defendants, and this court entered a consent decree on June 2, 2016. ECF No. 202.

This court granted HOPE's motion for leave to file its SAC in July 2016. *HOPE v. Eden Mgmt., LLC*, No. 13-CV-7391, 2016 WL 4011225, at *3–5 (N.D. Ill. July 27, 2016). The court also granted the plaintiffs' motion to reassign the other three HOPE cases filed in 2015 to the undersigned judge because they were related and the requirements of Local Rule 40.4 were satisfied. *Id*. at *5–7.

In opposing the motion for leave to file the SAC, the State Defendants argued that the then-proposed SAC did not demonstrate that plaintiffs had standing, but this court disagreed, finding that the SAC's allegations were independently sufficient to demonstrate standing. *Id*. at *3–4. The court concluded that:

> the Individual Plaintiffs . . . alleged the following: (1) they have suffered an injury in the form of rejection from the SLF; (2) the injury is fairly traceable to the State Defendants' action of promulgating and enforcing a 'no mental illness' policy for the SLFs; and (3) it is likely that the injury will be redressed by a favorable decision through injunctive relief whereby reforms to the State screening process and suitability determinations are ordered.

*Id*. at *4. Consistent with the SAC's allegations, the court also noted that "[a]lthough not required at this stage of the litigation, Plaintiffs have provided documentary evidence to support

---

[5] Plaintiffs' live complaint in the Eden Management case is their second pleading entitled Second Amended Complaint, the first iteration having been filed on July 27, 2016. ECF No. 205. This court granted the plaintiffs leave to modify the first SAC to reflect the intervening entry of the consent decree and the consequent dismissal of the claims against the Eden Management Defendants. Minute Entry, Aug. 5, 2016, ECF No. 206. The resulting version of the SAC still bears the title "Second Amended Complaint," though it notes the modification. ECF No. 207 at 1. The court refers to the live pleading in the Eden Management case as the SAC for simplicity's sake.

their position that the State Defendants communicated to the Eden Defendants a policy whereby all individuals with mental illnesses, not just those with severe or persistent mental illnesses, should be rejected from participating in the SLFs." *Id*. at *4 (citing Mem. Supp. Mot. Leave to File SAC Ex. K). Finally, this court decided that HOPE adequately alleged that it diverted sufficient resources to establish that it had organizational standing to sue. *Id*. at *4–5.

Arguing that granting leave to file the SAC would be futile, the State Defendants also referred the court to their Rule 12(b)(6) motions to dismiss the FAC. They claimed that the SAC failed to state a claim for the same reasons they contended the FAC did. The court did not reach the Rule 12(b)(6) issues, however, finding the briefing to be inadequate in view of the reassignment of the other three HOPE cases. The court reasoned that "[b]ecause the proposed amendments substantively alter[ed] the allegations and legal theories put forward by Plaintiffs relative to the State Defendants, the arguments made in the Defendants' original Rule 12(b)(6) motions may be inapplicable." *Id*. at *5.

The State Defendants then filed a fresh motion to dismiss in the Eden Management case. ECF No. 220. They also filed, or stood on, substantively identical Rule 12(b)(6) motions to dismiss in the other three HOPE cases. The parties agreed to consolidated briefing on those motions in all four cases, and the motions are ready to be decided.[6]

In their answers, the SLF defendants in two of the HOPE cases pleaded crossclaims for declaratory relief against the State Defendants. In identical motions, the State Defendants sought dismissal of those crossclaims for lack of subject matter jurisdiction. The SLF defendants in

---

[6] As stated in HOPE's response:

> In the interest of avoiding substantial unnecessary judicial effort, Plaintiffs' counsel contacted counsel for the State Defendants suggesting that the parties agree that the Court's resolution of the Rule 12(b)(6) arguments presented in the instant case be controlling as to non-standing issues in each of the related cases. Counsel for the State Defendants has agreed.

Resp. to State Defs.' Mot. to Dismiss 10, *HOPE v. Eden Mgmt., LLC*, No. 13-CV-7391, ECF No. 229.

*Eastgate Manor*, No. 15-CV-9717, settled their dispute with HOPE, and on May 25, 2017, the court entered a consent decree, which did not affect HOPE's claims against the State Defendants. ECF No. 90. The Eastgate Manor Defendants subsequently withdrew their crossclaim, so the court denied the State Defendants' motion to dismiss it as moot. Minute Entry, Sept. 14, 2017, ECF No. 94. As a result, only the motion to dismiss the crossclaim in the Tabor Hills case, No. 15-CV-9719, ECF No. 70, remains pending.

The Alden Gardens Defendants have separately moved to dismiss the counts pleaded against them in the complaint in Case No. 15-CV-9715. The court decides that motion today by separate order.

## C. Plaintiffs' Factual Allegations

For the most part, the SAC in the Eden Management case, ECF No. 207, encompasses the allegations made in the complaints filed in the other three related cases. The court draws the facts in the following summary from the SAC; for purposes of deciding the pending motions, the court assumes these facts are true and draws all reasonable inferences in plaintiffs' favor. *See Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 646 (7th Cir. 2017) (motion to dismiss for failure to state claim "ask[s] [the court] to treat the allegations in the complaint as true and to give the plaintiff the benefit of any reasonable and favorable inferences from those allegations." (citing *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010))).

HOPE states that its "mission includes promoting equal opportunity in housing and eliminating unlawful discriminatory housing practices." SAC ¶ 37. It seeks to advance its mission through education, training, outreach, advocacy, and public policy initiatives, investigation of FHA violations, and enforcement. *Id*. HOPE counsels housing seekers and

providers on their rights and responsibilities and, as in these cases, investigates complaints using testers. *Id.* ¶ 39.

Eden Management requires potential participants to complete a preliminary application which asks about "[a]ny mental diagnosis." *Id.* ¶¶ 96–97. Eden Management "categorically rejects" anyone who answers yes and lists any mental diagnosis. *Id.* ¶ 98; *see also id.* ¶ 102 (alleged statement by Eden Management's Director of Marketing of a "no mental illness" policy). O'Connor called Eden Management in October 2012 to inquire about a possible placement. *Id.* ¶ 116. When she told the person with whom she spoke during screening that she had received a mental health diagnosis, the person on the other end of the call responded that "Eden did not accept people with her mental health diagnosis and hung up." *Id.* ¶ 119. O'Connor called back the next month, but she did not state that she had received a mental health diagnosis. *Id.* ¶¶ 120–21. Eden Management made an appointment with the state for her to undergo a Determination of Need ("DON") screening, but when she called Eden on December 4, 2012, to ask specifically about her mental health diagnosis, the representative with whom she spoke told her that Eden did not accept anyone with any mental health diagnosis. *See id.* ¶¶ 122–27. As a result, O'Connor gave up. *Id.* ¶ 127.

Despite her mental health diagnosis, Mormino lived at an Eden Management SLF from 2005 until 2008 when she was transferred to a nursing facility. *See id.* ¶¶ 138–41. She made substantial progress by 2013 such that her doctor documented that her physical issues superseded her mental health issues, so she was told to apply to the Eden Management facility again. *Id.* ¶ 141. Mormino applied to Eden Management in October 2013. *Id.* ¶ 142. Eden Management wrote her on November 20, 2013, that to be placed at Eden, "the individual [must] be without a primary or secondary diagnosis of developmental disability or serious and persistent mental

illness." *Id.* ¶ 143 (presumptively quoting letter; no source identified). Eden Management

wanted Mormino to have a more recent mental health screening than her 2009 screening, but

plaintiff alleges that this reason, which eventually constituted Eden Management's stated reason

for denying Mormino's application, was pretextual. *See id.* ¶¶ 144–47. Mormino eventually

moved into an apartment in 2015. *Id.* ¶ 150. Nevertheless, she would benefit from living in a

supportive living facility; her Determination of Need score allows her to live in one; and she still

wants to live in one. *See id.* ¶¶ 148–52.

HOPE responded to O'Connor's and other complaints by launching an investigation

using trained testers to call Eden Management three times between January and August 2013.

*See id.* ¶¶ 153–70. The testers placed calls to Eden on behalf of test family members with

primary mental health diagnoses; with favorable inferences drawn for plaintiffs, the testers met

with categorical rejections based on those diagnoses. *See id.* An Eden Management

representative rebuffed the third tester, for instance, with the statement that "none of Eden's

residents can have a primary or secondary mental illness." *Id.* ¶ 170 (not purported to be exact

quotation).

Another tester called the Tabor Hills SLF in Naperville in November 2013. *Id.* ¶ 171.

The tester said that she was looking for housing for her aunt, who had a secondary diagnosis of

schizophrenia that had been controlled for years by medication. *Id.* ¶¶ 171–72. The Tabor Hills

representative "responded that it is a written rule of the State of Illinois that supportive living

facilities may not take anyone with a psychiatric diagnosis." *Id.* ¶ 172. The tester called the

other two SLFs HOPE has sued, Eastgate Manor and Courtyard Estates, and made similar

inquiries about an aunt with a mental health diagnosis; again drawing favorable inferences for

plaintiffs, both responses included a statement that people with a mental health diagnosis were

not allowed, though the Courtyard Estates representative said that an exception might be possible "this one time." *Id.* ¶¶ 176–77.

From its investigation, these tests, and O'Connor and Mormino's experiences, HOPE concluded that the State Defendants act in concert with SLFs to deny intentionally applicants with a mental health diagnosis. *Id.* ¶ 177A.

## D. Claims and Relief Requested

Plaintiffs bring claims against the State Defendants under the FHA, Title II of the ADA, and Section 504 of the Rehabilitation Act respectively in Counts IV–VI of the SAC.[7] They seek only injunctive relief on those counts. SAC ¶¶ 221, 227, 233. They state that:

> The Illinois HCBS Waiver, the Administrative Code, and all other applicable State policies and procedures should be modified to eliminate discrimination based on disability, including actual or perceived mental illness disability, in provision of housing and services under the Supportive Living Program. The Illinois HCBS Waiver and all other applicable State policies and procedures should also be modified to require that State agencies and providers of supportive housing funded under the HCBS Waiver conduct outreach, advertising, application processes and residency screening in full accordance and compliance with fair housing, including (a) that no inquiries into the nature and severity of a person's disability are made by the SLF and [sic] until the appropriate point in the process for properly determining eligibility and need for supportive services, (b) that informed consent will be elicited and provided, (c) that appropriate preadmission screening must be performed and completed in a nondiscriminatory manner by a trained professional; and (d) that Supportive Living Program housing will not be denied based on mental health conditions where the prospective resident is otherwise qualified. This injunctive relief is necessary to further the goals of federal anti-discrimination laws affecting housing and supportive living services, and to remedy the illegal conduct of Eden Defendants and

---

[7] As already mentioned, plaintiffs' claims against the Eden Management Defendants have been dismissed as part of the consent decree entered in No. 13-CV-7391. Rather than delete Counts I–III from the SAC, plaintiffs elected to preserve the numbering of counts used in their earlier complaints. They modified the title of Counts I, II, and III to note that the count has been dismissed. *E.g.*, SAC at 50.

the State Defendants in this case.

*E.g.*, SAC ¶ 222.

In the SAC's prayer for relief, plaintiffs list 17 specific requests for injunctive relief consistent with that statement. *See id*. at 66–69. They include changes to the contents of Illinois' HCBS waiver; changes to Illinois' regulations governing the Supportive Living Program; and changes to documents, forms, and websites associated with the Supportive Living Program. *See id*. at 66–68. Plaintiffs also ask the court to enjoin the State Defendants to require all Supportive Living Facilities to certify their compliance with non-discrimination laws annually, provide instruction and training to DON screeners, "[i]mplement criteria for DHS Division of Mental Health screeners to determine whether a person with a mental illness who also has a physical disability is suitable for a Supportive Living Facility as a 'level of care,'" make changes to the computer system used by DON screeners and associated form letters used when an applicant is suspected of having a mental illness diagnosis, and publicize its implementation of the injunction. *Id*. at 68–69.

## II.  LEGAL STANDARDS

The State Defendants' motions to dismiss focus primarily on whether the complaint states a claim for which relief can be granted on the merits, but they also raise questions of this court's subject matter jurisdiction over two defendants and a crossclaim. The court therefore recites the procedural standards governing motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (6).

### A.  Subject Matter Jurisdiction (Rule 12(b)(1))

A Rule 12(b)(1) motion to dismiss allows a party to challenge the existence of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion raises either a facial or factual challenge to subject matter jurisdiction. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir.

2015) (citing *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009)).  A facial challenge claims that the complaint's, or another pleading's, allegations are insufficient, while "[a] factual challenge contends that 'there is in fact no subject matter jurisdiction,' even if the pleadings are formally sufficient."  *Id.* (quoting *Apex Digital*, 572 F.3d at 444) (emphasis omitted).  Regardless of which type of challenge is raised, the plaintiff, as the party invoking federal jurisdiction, always bears the burden to establish that subject matter jurisdiction exists.  *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn–Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012).

The pending motions challenge the sufficiency of pleadings, specifically the SAC and a crossclaim pleaded in an answer, to invoke this court's subject matter jurisdiction, so this case presents a facial challenge.  When determining if subject matter jurisdiction is proper on a facial challenge, "the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor."  *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015) (quoting *Reid L. v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004).

## B.  Failure to State a Claim (Rule 12(b)(6))

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint.  *Christensen v. Cnty. of Boone*, 483 F.3d 454, 457 (7th Cir. 2007).  To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim satisfies this standard when its factual allegations "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555–56; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a

story that holds together."). For purposes of a motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

### III. JURISDICTIONAL ISSUES

Subject matter jurisdiction must always be the first order of business. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). ("The requirement that jurisdiction be established as a threshold matter . . . is 'inflexible and without exception.'" (quoting *Mansfield, C. & L. M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884))). The pending motions raise two jurisdictional challenges. In the first, two of the State Defendants claim that they are entitled to Eleventh Amendment immunity from Plaintiffs' claims. In the second, the State Defendants claim that this court lacks jurisdiction over a crossclaim pleaded by Tabor Hills Supportive Living Facility, LLC ("Tabor Hills"), the SLF operator HOPE has sued in No. 15-CV-9719. As in the first issue, the State Defendants invoke their Eleventh Amendment immunity in seeking dismissal of the crossclaim. The State Defendants also contend that a live case or controversy does not exist between them and the Tabor Hills Defendants. *See* U.S. Const. Art. III, § 2. The court discusses the common Eleventh Amendment principles and then addresses each jurisdictional challenge separately.

### A. The Eleventh Amendment and *Ex Parte Young*

"The Eleventh Amendment grants states immunity from private suits in federal court without their consent." *Nuñez v. Ind. Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)) (other citation omitted). It sets "limitations . . . upon federal jurisdiction." *Nelson v. La Crosse Cnty. Dist. Attorney*, 301 F.3d

820, 829 (7th Cir. 2002) (quoting *Seminole Tribe*, 517 U.S. at 73). The sovereign immunity

protected by the Eleventh Amendment extends to suits against a state official in his or her official

capacity, as for money damages, "because . . . 'a judgment against a public servant in his official

capacity imposes liability on the entity that he represents . . . .'" *Kentucky v. Graham*, 473 U.S.

159, 170 (1985) (quoting *Brandon v. Holt*, 469 U.S. 464, 471 (1985)) (second ellipsis in

original). This rule has three recognized exceptions. *Nuñez*, 817 F.3d at 1044 (citing *Marie O. v.

Edgar*, 131 F.3d 610, 615 (7th Cir. 1997)). One is the doctrine of *Ex Parte Young*, 209 U.S. 123,

159–60 (1908), under which the Eleventh Amendment does not bar suits seeking prospective

equitable relief against state officials. *Nuñez*, 817 F.3d at 1044 (citing *Marie O.*, 131 F.3d at

615).

**B. The Non-HFS Defendants' Motion to Dismiss Under the Eleventh Amendment**

     None of the State Defendants' questions *Young*'s applicability to the equitable relief

sought in these cases. Instead, Illinois Governor Bruce Rauner and Jennifer Reif, the Deputy

Director of the Illinois Department on Aging, claim that their connection to the programs and

practices Plaintiffs challenge is too attenuated to make them proper defendants under *Young*.

They contrast their role with that of the other State Defendants, all of whom are affiliated with

either the Illinois Department of Healthcare and Family Services, which operates Illinois'

Medicaid Program, or the Illinois Department of Human Services, which has jurisdiction over

the agents who conduct the mental health screenings used to determine eligibility for placement

in a Supportive Living Facility. Non-HFS State Defs.' Mot. to Dismiss 22–23.

     *Young* does not grant carte blanche to sue any state official. The state official must have

"some connection with the enforcement of the Act" being challenged. *Entm't Software Ass'n v.

Blagojevich*, 404 F. Supp. 2d 1051, 1070 (N.D. Ill. 2005) (quoting *Young*, 209 U.S. 157). "A

theory of liability predicated on a governor's general obligations as the executive of the State cannot avoid the consequences of the Eleventh Amendment." *Johnson v. Rauner*, No. 15 C 131, 2016 WL 3917372, at *3 (N.D. Ill. July 20, 2016) (quoting *Ill. League of Advocates for the Developmentally Disabled v. Quinn*, No. 13 C 1300, 2013 WL 5548929, at *4 (N.D. Ill. Oct. 8, 2013)). However, he court looks to the state official's "duties and powers" to determine whether the official has a sufficient connection to enforcing the state law under *Young*. *Deida v. City of Milwaukee*, 192 F. Supp. 2d 899, 914 (E.D. Wis. 2002) (citing *Sherman v. Cmty. Consol. Sch. Dist. 21*, 980 F.2d 437, 441 (7th Cir. 1992).

The complaint alleges enough to show that Illinois' governor has 'some connection' to enforcing the challenged rules, policies, and practices of the Supportive Living Program. Plaintiffs allege that the governor's office issued notices to Supportive Living Facilities governing the Supportive Living Program, including a June 20, 2011, informational notice on the eligibility of people determined to have a serious and persistent mental illness or disability. SAC ¶ 89(c). Seen favorably to Plaintiffs, this suffices at the pleading stage to show that the governor has "'some connection' with the enforcement of the" Supportive Living Program. *Weinstein v. Edgar*, 826 F. Supp. 1165, 1166 (N.D. Ill. 1993).

As alleged, the Department on Aging also has some direct enforcement connection to the Supportive Living Program. As an initial matter, the State Defendants note that the Department on Aging's current director is Jean Bohnhoff. *E.g.*, Mot. to Dismiss 1 n.1, ECF No. 220. Under Federal Rule of Civil Procedure 25(d), Bohnhoff is automatically substituted for Jennifer Reif, because Plaintiffs sue her solely in her official capacity. The State Defendants say that the "Department on Aging and its contracted agencies undertake Determination of Need screenings for the elderly who seek SLF admissions, but the Department on Aging is not involved in mental

health screening"—again, those duties formally fall under the jurisdiction of the Department of Healthcare Services. Non-HFS State Defs.' Mot. to Dismiss 22.

All that may be true, but Plaintiffs make plausible allegations that the Department on Aging is responsible for assessing the people who make initial level-of-care determinations at Supportive Living Facilities. SAC ¶ 58. The remedies Plaintiffs seek include altering how those decisions are made and training the decision makers, so by plausibly pleading that the Department on Aging has indirect enforcement authority, Plaintiffs allege a sufficient connection between the Department on Aging and the relief sought. *See Int'l Ass'n of Machinists Dist. 10 v. Wisconsin*, 194 F. Supp. 3d 856, 861–63 (W.D. Wis. 2016) (state official proper defendant under *Ex Parte Young* because he had "indirect authority to enforce" statute which included "the authority to direct . . . investigators as to how a statute must be interpreted and applied"); *Entm't Software*, 404 F. Supp. 2d at 1071 (state attorney general sufficiently connected to challenge to Illinois criminal law because, even though the attorney general was not involved directly in local prosecutions, she, among other things, was charged with "providing advice and assistance" to local prosecutors).

Read favorably to them, Plaintiffs' SAC plausibly alleges a sufficiently direct connection between, on the one hand, operation and enforcement of the Supportive Living Program and, on the other, the Governor of Illinois and the Director of its Department on Aging. Their motion to dismiss under the Eleventh Amendment must therefore be denied.

## C. The Tabor Hills Crossclaim Against the State Defendants

In its answer, Tabor Hills pleads a single count that it describes as a counterclaim against HOPE and crossclaim against the State Defendants for declaratory relief. *See* Tabor Hills Ans. & Cross-cl. 60–64, No. 15-CV-9719, ECF No. 56 (hereinafter "Cross-cl."). The Declaratory

Judgment Act, 28 U.S.C. §§ 2201–02, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Where declaratory relief is concerned, Article III's requirement that a "case" or "controversy" exist means that the dispute must "be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937) (alterations and internal quotations omitted)). For a case or controversy to exist, the party invoking the court's jurisdiction "must demonstrate a personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues necessary for the proper resolution of constitutional questions." *DND Int'l, Inc. v. Fed. Motor Carrier Safety Admin.*, 843 F.3d 1153, 1158 (7th Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).

In its crossclaim, Tabor Hills couches its descriptions of federal law violations in terms of what HOPE alleges: Illinois' waiver, rules, policies, and practices conflict with federal antidiscrimination law. Cross-cl. ¶¶ 1, 14–15, 21. Twice Tabor Hills asserts that it "takes no position as to whether such a conflict exists." *Id.* ¶ 1, 23. Tabor Hills seeks a declaration of: "a. Whether the Illinois Regulations conflict with the Fair Housing Act, the Americans with Disabilities Act and the Rehabilitation Act; and b. to the extent a conflict exists, which laws Tabor Hills should follow." Cross-cl. ¶ 23.

By remaining neutral on whether a federal law violation is occurring, Tabor Hills has not

demonstrated that it has the needed "personal stake" in the outcome of its crossclaim. *See Lyons*, 461 U.S. at 101. Tabor Hills cannot bootstrap its standing on HOPE's injuries; it must assert its own. *See Jones v. Ill. Dep't of Rehab. Servs.*, 689 F.2d 724, 733 (7th Cir. 1982) (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (finding college lacked standing to bring cross claim for declaratory relief against state asserting applicant's right to reimbursement because "a complainant [generally] must assert his own legal interests, rather than those of a third party, to maintain an action in the federal courts").

Tabor Hills' crossclaim could also be read as seeking contingent relief: If HOPE wins, please declare what I must do to comply with state and federal laws. *See* Cross-cl. ¶¶ 23–24. Read this way, Tabor Hills wants a legal opinion on a "hypothetical state of facts." *MedImmune*, 549 U.S. at 127 (quoting *Aetna*, 300 U.S. at 241). If the crossclaim were severed, *see* Fed. R. Civ. P. 42(b), it could not be adjudicated unless and until HOPE's claims against the State Defendants were determined because the declaration Tabor Hills wants would only matter if HOPE won. And even then, Tabor Hills takes no position on what HOPE winning would mean; it asks the court to answer that question in the abstract. *See* Cross-cl. ¶¶ 23– 24. This hardly sharpens the issues through presentation by adversaries with divergent legal interests.

Things would be different if Tabor Hills took the position that some portion of the Supportive Living Program as the State Defendants administer it runs afoul of a federal law, such as the FHA, ADA, or the Rehabilitation Act. If it contended the State Defendants violated federal law, Tabor Hills could seek declaratory relief provided it showed that it was being coerced through the SLP to violate federal law. *See MedImmune*, 549 U.S. at 129 (collecting and discussing authority).

Tabor Hills responds that it need not risk violating state law to obtain declaratory relief.

The court agrees with the premise but not the conclusion. Putting someone who wishes to challenge a law "to the choice between abandoning his rights or risking prosecution . . . is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune*, 549 U.S. at 129 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967)). But Tabor Hills does not claim that it faces any comparable dilemma because it "takes no position" on whether it has any federal rights to abandon on pain of prosecution by the State Defendants. Cross-cl. ¶ 23.

Tabor Hills' efforts to invoke the *Ex Parte Young* exception founder for the same reason. To decide whether *Young* applies, a court need only conduct a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)) (alteration omitted). Ordinarily, an allegation of an ongoing violation of federal law suffices. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997); *see also MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 345 n.13 (7th Cir. 2000). But Tabor Hills stands silent in its crossclaim on whether federal law is being violated. Cross-cl. ¶ 23. So the crossclaim does not seek to conform the State Defendants' future conduct to any rule of federal law articulated by Tabor Hills. *See MCI Telecomms.*, 222 F.3d at 345 (finding *Young* applied for this reason).

Accordingly, Tabor Hills has not demonstrated that this court has jurisdiction to decide its crossclaim. It must therefore be dismissed.

## IV. ADA AND REHABILITATION ACT CLAIMS AGAINST THE STATE DEFENDANTS

Plaintiffs and the State Defendants treat the ADA and Rehabilitation Act analyses together in their briefing. With the exception of its standard of causation, a matter not presently

at issue,[8] "the Rehabilitation Act incorporates the standards applicable to . . . the ADA." *Brumfield v. City of Chicago*, 735 F.3d 619, 630 (7th Cir. 2013) (citing *Silk v. City of Chicago*, 194 F.3d 788, 798 n.7 (7th Cir. 1999)) (other citations omitted) (analogizing to Title I). Title I of the ADA covers employment; Title II covers "public services, programs, and activities;" and Title III covers "public accommodations." *Id.* (quoting *Tennessee v. Lane*, 541 U.S. 509, 516–17, (2004)). The State Defendants raise the single question of whether the complaints state a claim of discrimination under both statutes in their motions to dismiss. As that aspect of the two standards does not differ, the court determines, for present purposes, that Plaintiffs' Rehabilitation Act claims against the State Defendants are "functionally identical" to their claims against the State Defendants under Title II of the ADA. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (citing *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) (treating Title II and Rehabilitation Act claims together).

The State Defendants meet Title II of the ADA's definition of "public entity." *See* 42 U.S.C. § 12131(1)(A)–(B) (defining the term "public entity" to include state and local governments and their "department[s], agenc[ies], . . . and instrumentalit[ies]"). Title II declares that "no qualified individual with a disability shall, by reason of such disability, be excluded

---

[8] Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).

The difference between the ADA and the Rehabilitation Act stems from Section 504's "solely by reason of" language. *Brumfield v. City of Chicago*, 735 F.3d 619, 630 (7th Cir. 2013). To state a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, a plaintiff must plausibly "allege that (1) he is a qualified person (2) with a disability and (3) the [state agency] denied him access to a program or activity because of his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (quoting *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2002)); *accord Mallett v. Wis. Div. of Voc. Rehab.*, 130 F.3d 1245, 1257 (7th Cir. 1997) (citing *Knapp v. Nw. Univ.*, 101 F.3d 473, 478 (7th Cir. 1996)).

from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (West 2017).

When it enacted the ADA, Congress sought "to enforce [a] prohibition on irrational disability discrimination" in Title II and "to enforce a variety of other basic constitutional guarantees." *Lane*, 541 U.S. at 522 (citations omitted); *see also id*. at 522–23 (discussing constitutional rights). "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Id*. at 524. To cite one example used by the Supreme Court, as late as 1979, most states did not allow people with mental and developmental disabilities, categorized as "idiots" under state law, to vote, regardless of the individual's capacity. *Id*. (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 464, and n.14 (1985)). When it enacted the ADA, Congress found that persistent disability discrimination exists in "education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101(a)(3).

Plaintiffs discuss the elements of a prima facie case under the ADA. Resp. to State Defs.' Mot. to Dismiss 2, ECF No. 229. The prima facie case might be used to analyze a motion for summary judgment. *See, e.g.*, *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 489 (7th Cir. 2014) (discussing elements of prima facie case of disability discrimination in employment at summary judgment); *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (case cited by Plaintiffs; decided at summary judgment; listing elements of prima facie case). But a Plaintiff "need not plead all of the elements of a prima facie case of discrimination under the ADA and the Rehabilitation Acts." *Revolinski v. Nat'l R.R. Passenger Corp.*, No. 08-C-1098, 2010 WL 2606316, at *5 (E.D. Wis. Apr. 16, 2010). The Supreme Court made clear in

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2003) that "the prima facie case . . . is an evidentiary standard, not a pleading requirement." *Id.* (ellipsis in original) (quoting *Swierkiewicz* and extending its reasoning under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* to ADA and Rehabilitation Act claims); *see also Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) ("*Swierkiewicz* survived *Twombly* and *Iqbal*" (citing *Luevano v. Wal– Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir. 2013) and *Swanson*, 614 F.3d at 404)). To establish a violation of Title II of the ADA, "the plaintiff must prove (1) that he is a 'qualified individual with a disability,' (2) that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and (3) that the denial or discrimination was 'by reason of' his disability." *Wagoner*, 778 F.3d at 592 (quoting *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996)) (numbering added)..

The State Defendants contend that Plaintiffs state no actionable claim that they experienced discrimination prohibited by the ADA and the Rehabilitation Act because, in short, the State Defendants have discretion unfettered by the ADA or the Rehabilitation Act to decide what groups to target when requesting and implementing a Medicaid waiver program like the SLP. They emphasize that, by design, the Medicaid law affords them a great deal of discretion in designing and administering Illinois' Medicaid Program. They quote the following observation about Medicaid's structure:

> [T]he Medicaid Act empowers States to select dramatically
> different levels of funding and coverage, alter and experiment
> with different financing and delivery modes, and opt to cover (or
> not to cover) a range of particular procedures and therapies. States
> have leveraged this policy discretion to generate a myriad of
> dramatically different Medicaid programs over the past several
> decades.

*Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 2632 (2012) (Ginsburg, J., concurring in part and dissenting in part) (quotation omitted). The State Defendants omit the beginning of the

quoted sentence: "Subject to [the Medicaid Act's] basic requirements . . . ." *Id.*; *See also* Mot. to Dismiss 10, ECF No. 220.

The Medicaid Act limits Illinois' discretion in operating its plan. "Although participation in Medicaid is optional, once a state has chosen to take part . . . it must comply with all federal statutory and regulatory requirements." *Bontrager v. Ind. Family & Soc. Servs. Admin.*, 697 F.3d 604, 606 (7th Cir. 2012) (quoting *Miller ex rel. Miller v. Whitburn*, 10 F.3d 1315, 1316 (7th Cir. 1993)). The Medicaid Act requires a state's plan to make medical assistance available to a list of statutorily defined groups, and medical assistance must include a list of required medical care and services. *See* 42 U.S.C. § 1396a(a)(10)(A) (West 2017). States may also provide other care and services, consistent with the Medicaid program's requirements, at their option. *See* §§ 1396a(a)(10)(A). But when a state undertakes to provide optional services, it "is required to provide Medicaid coverage for medically necessary treatments in those service areas." *Bontrager*, 697 F.3d at 608 (citing *Beal v. Doe*, 432 U.S. 438, 444 (1977)) (other citations omitted). Where an action falls within discretion granted by the Medicaid Act and runs afoul of no other law, states can treat the same issue differently in their discretion. *See Wis. Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 495 (2002) ("[W]e have not been reluctant to leave a range of permissible choices to the States, at least where the superintending federal agency has concluded that such latitude is consistent with the statute's aims.").

As the State Defendants point out, federal regulations require states to choose one or more target groups, or a subgroup of one of the listed groups, when applying for a waiver under the home and community-based services program: "[a]ged or disabled, or both;" "[i]ndividuals with [i]ntellectual or [d]evelopmental [d]isabilities, or both;" and the "[m]entally ill." 42 C.F.R. § 441.301(b)(6)(i)–(iii) (2013) (numbering omitted). Illinois chose the first option in its waiver

application, targeting "aged" and "physically disabled" in the SLP.  SAC ¶ 67.  In its SLP waiver

Illinois narrowed its target group to "individuals . . . without a primary or secondary diagnosis of

a developmental disability and serious and persistent mental illness."  ECF No. 201-1 Ex. 2.

Plaintiffs and the State Defendants debate what Illinois' discretion to target certain groups

means for Plaintiffs' ADA and Rehabilitation Act claims.  Plaintiffs see no room for "targeting" a

secondary diagnosis defined expressly in terms of a disability.  The State Defendants note that

the regulation allows a state to select a subgroup of the three listed groups for targeting, so their

discretion to target, say, people older than sixty-five who do not use wheelchairs or to carve out

from the physically disabled everyone who has an emotional disability remains unfettered.

Given that Plaintiffs seek only prospective relief against the State Defendants, recent

amendments to the regulations clear up whatever ambiguity there may be.  *See* § 441.301(b)(6).

effective January 20, 2017, *see* 81 Fed. Reg. 86457 (Nov. 30, 2016).  Under those regulations

"[t]he Medicaid agency's standards and methods for providing information to applicants and

beneficiaries and for determining eligibility must be consistent with the objectives of the

program and with the rights of individuals under . . . section 504 of the Rehabilitation Act . . .

[and] the Americans with Disabilities Act" among other federal laws.  42 C.F.R. § 435.901 (West

2017); *see also id*. § 430.2(b) (incorporating regulations implementing § 504 of the

Rehabilitation Act by reference).

With this reference to anti-discrimination laws, the authorization of subgrouping in

§ 440.301(b)(6) must be understood as permitting defining and targeting subgroups in a way that

does not violate the ADA and Rehabilitation Act, such as by geography.  This does not threaten

Illinois' discretion to decide what methods to use to fill the limited number of slots in a waiver

program with qualified individuals.  *See Bertrand*, 495 F.3d at 457 (upholding Illinois' method of

running the waiting list for one waiver program).

In a variant on their argument about their discretion to exclude some people, the State Defendants contend that *Doe v. Mutual of Omaha,* 179 F.3d 557 (7th Cir. 1999), is controlling. In *Doe*, Plaintiffs claimed that two caps on lifetime benefits for AIDS or AIDS-related conditions in policies issued by private insurers violated Title III of the ADA, which concerns public accommodations. *Id*. at 558. Comparing the Plaintiffs' claims to a request that a bookstore stock braille books to accommodate a blind person, *see Lenox v. Healthwise of Ky., Ltd.*, 149 F.3d 453, 457 (6th Cir. 1998), the court held that "[t]he common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated" and rejected the plaintiffs' claims. *Doe*, 179 F.3d at 560. The court used several hypotheticals to illustrate the distinction between what Title III reaches and what it does not. *See id*. at 559–61. A store would violate the ADA by refusing to sell a camera to a person with a disability, but the ADA does not require the store to stock cameras specially designed for people with disabilities. *Id*. at 560.

*Doe*'s hypothetical psychiatrist comes closest to this case. A psychiatrist's "refusal to treat schizophrenia" would be permissible under Title II, but, added the *Doe* court, the psychiatrist's conduct would be "distinct from his refusing to treat schizophrenics for the psychiatric disorders in which he specializes." *Id*.

The State Defendants say that they are like the insurance companies sued in *Doe* and, by extension, the hypothetical psychiatrist. Since Medicaid is a form of insurance, how, they ask, can the ADA and Rehabilitation Act required them to modify the Supportive Living Program to take all people with mental disabilities when a private insurer would not be required to change what its insurance policy covered in the same circumstances?

Framing the question this way sets up a straw man by mischaracterizing Plaintiffs' ADA and Rehabilitation Act claims. Plaintiffs do not contend that DON screenings should end or that all persons with mental diagnoses or disabilities must be placed in a Supportive Living Facility regardless of their unique history and condition. Rather than categorically exclude mental health conditions, they want suitability for the Supportive Living Program to be determined based on a person's "tenant or residential history and background." SAC at 67. Just as a psychiatrist who specializes in, say, depression could not refuse to treat schizophrenics based on that additional diagnosis alone, *Doe*, 179 F.3d at 560, the State Defendants, having decided to specialize in the elderly and people with physical disabilities, cannot turn away elderly or physically disabled schizophrenics or people diagnosed with any other mental illness categorically. As Plaintiffs put their position in their response, "where otherwise qualified individuals, such as Plaintiffs, fall into the target group, it is improper for the State to then exclude them from living in SLFs on the basis of mental health diagnoses that do not render them unsuitable to live as residents in an SLF." Resp. to Defs. Mot. to Dismiss 12, ECF No. 229.

The leading case of *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) makes plain that Title II subjects to scrutiny state decisions placing people with mental disabilities in a restrictive facility rather than community-based care. *See id*. at 601–02. Indeed, the Supreme Court cited the community-based waiver program, the federal component of which is at issue here, in reasoning that "unjustified institutional isolation of persons with disabilities is a form of discrimination" under Title II. *Id*. at 600 (responding to the argument that Medicaid favored institutionalization before the waiver program by pointing to a federal "policy of encouraging States to take advantage of the waiver program"). After *Olmstead*, "states must comply with the ADA's integration mandate, which dictates that states 'shall administer services, programs, and

activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.'" *Steimel v. Wernert*, 823 F.3d 902, 907 (7th Cir. 2016) (quoting 28 C.F.R. § 35.130(d) (1998)). The Seventh Circuit has repeatedly said that "[w]hile "a State is not obligated to create new services,' it 'may violate Title II when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community-integrated setting.'" *Id*. at 913 (quoting *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 699, 609 (7th Cir. 2004)).

The Plaintiffs here plausibly allege *Olmstead* claims. Both O'Connor and Mormino sought to transfer out of institutional settings but found the SLFs' doors closed to them due to their mental illness diagnoses. Viewed in a light favorable to Plaintiffs, HOPE's testers got nowhere with their inquiries to the SLFs for the same reasons. All allege plausibly that they wish to benefit from a placement in a community-based setting, and all allege that after functional evaluation of the effect of their mental illness on their suitability for placement in a community-based setting, they would be qualified. The circular contention that they are unqualified because they have a mental health diagnosis fails. Under *Olmstead*, qualification means that a plaintiff "was eligible to receive services through [the] State's Medicaid Program, he preferred to receive such services in a community-based setting, and community-based services were appropriate for his needs." *Radaszewski*, 383 F.3d at 613 (citing *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003)) (holding complaint with these allegations stated claim under *Olmstead*). The State Defendants point out that no plaintiff has been screened. The Plaintiffs allege, however, that the state Defendants' website, documents, regulations, and communications to the SLFs assured that would be the case, effectively cutting the individual plaintiffs and the testers' 'aunts' off before any need assessment could be conducted. *See* SAC ¶¶ 75–89. Hence there is no evaluation by a

trained professional, favorable or not, to which deference might be owed on whether a community-based setting would be appropriate. *Cf. Jenkins v. N.Y.C. Dep't of Homeless Servs.,* 643 F. Supp. 2d 507 (S.D.N.Y. 2009) (holding that plaintiff had to be deemed unqualified even though he disagreed with assessment because court had to give deference to decision under *Olmstead*). Whether living in an institution or isolated at home, they faced the sort of stigmatization that *Olmstead* holds is prohibited discrimination under Title II. *See Steimel*, 823 F.3d at 914 ("hold[ing] that the integration mandate is implicated where the state's policies have either (1) segregated persons with disabilities within their homes, or (2) put them at serious risk of institutionalization").

## V.  FAIR HOUSING ACT CLAIMS AGAINST THE STATE DEFENDANTS

Congress passed the FHA, in short, "to replace the ghettos by truly integrated and balanced living patterns." *Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (en banc) (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972)). Plaintiffs sue under two sections of the FHA. The first, § 3604(f), makes it unlawful, among other things, to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter." 42 U.S.C. § 3604(f)(1)(A). Under federal pleadings standards, a plaintiff must "at least identify the type of discrimination that allegedly occurred, who brought about that discrimination, and when that discrimination took place." *Access Living of Metro. Chi. v. Prewitt*, 111 F. Supp. 3d 890, 899 (N.D. Ill. 2015) (citing *Swanson*, 614 F.3d at 405). The other FHA provision, § 3617, makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604." To

state a claim for a violation of § 3617, the plaintiff must allege: "(1) [the plaintiff] is a protected individual under the FHAA; (2) [the plaintiff was] engaged in the exercise of their fair housing rights; (3) Defendants threatened, coerced, intimidated or interfered with Plaintiffs on account of their protected activity under the FHAA; and (4) Defendants were motivated by a desire to discriminate." *Stevens v. Hollywood Towers & Condo. Ass'n*, 836 F. Supp. 2d 800, 810 (N.D. Ill. 2011) (citing *Bloch*, 587 F.3d at 783). Finally, § 3604(f)(2)(A) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of … that person."

The State Defendants assert that O'Connor, Mormino, and HOPE's testers were seeking government services under the SLP Program; they were not prospective "renters" or "buyers" of a dwelling.[9]  42 U.S.C. § 3604(f)(1)(A). First, relief under § 3617 can be sought by "any person," so the definition of "renter" does not affect Plaintiffs' claim under that section. The State Defendants do not discuss the FHA's definition of "to rent." While the FHA has no definition of "renter," it defines the verb "to rent" as "includ[ing] to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant." 42 U.S.C. § 3602(e). To satisfy this definition, a plaintiff need do no more than allege that the owner "received some consideration for permitting them to reside in [a] dwelling[ ]." *Hunter ex rel. A.H. v. District of Columbia*, 64 F. Supp. 3d 158, 178 (D.D.C. 2014). That said, when the source of consideration is not the owner or occupier, a plaintiff sometimes can qualify as not a

---

[9] The FHA defines a "dwelling" this way: "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b). The term has been given a generous and expansive construction. *See generally Lauer Farms, Inc. v. Waushara Cnty. Bd. of Adjustment*, 986 F. Supp. 544, 559 (E.D. Wis. 1997) (collecting cases and types of structures).

"renter" under § 3604(f)(1) but still have a claim under the broader language allowing claims on behalf of "any person" in §§ 3604(f)(2) and 3617. *See id.* (holding plaintiff could not sue under § 3604(f)(1) because homeless shelter received consideration for occupancy from government but that he could proceed under other subsections of the FHA because the definition of "to rent" was satisfied).

The SAC adequately alleges that SLP participants pay "some consideration" to occupy the Supportive Living Facilities. Plaintiffs describe Illinois' Supportive Living program as "combining apartment-style housing with personal care and other services." SAC ¶ 65. And the HCBS program requires people living in home and community-based facilities to pay their own room and board. *See* 42 U.S.C. § 1396n(c)(1). The State Defendants' motion to dismiss says that "SLFs provide apartment-style housing and . . . services." ECF No. 220 at 3. The State's waiver application for the SLP gives more detail:

> Supportive living facilities (SLFs) must have a minimum of ten (10) apartments and may have a maximum of 150. Each apartment is private with a locked door and is required to have a living area, bedroom, kitchen and a private bathroom. Participants only share double occupancy apartments by choice. Participants may receive visitors of their choice at any time. They may also come and go from the supportive living facility as they choose. Common areas are required in the building for dining, socialization and participant personal use.

ECF No. 207-1 Ex. 2 (describing services provided as well). As even a small amount of consideration suffices, these allegations and the structure of the home and community-based waiver program adequately plead that people pay some consideration to occupy a Supportive Living Facility. *See Villegas v. Sandy Farms, Inc.*, 929 F. Supp. 1324, 1328–29 (D. Or. 1996) (holding payment of $1.50 made migrant farm workers renters of cabins).

The State Defendants also direct the court to FHA regulations allowing property owners to inquire about the nature of a potential resident's disability when a dwelling is available solely

to people with disabilities, or they receive higher priority. *See* 24 C.F.R. §100.202(c)(2) and (3) (West 2017). But Plaintiffs do not take issue with the questions O'Connor, Mormino, and the testers were asked. Plaintiffs complain about what happened when they answered, i.e., a constructive denial of participation in the SLP based on their mental health diagnoses (or the SLF representatives' belief that one existed). *See* SAC ¶ 219 (listing alleged forms of violations; no claimed unlawful inquiry); *see also id*. ¶ 219(d) (claiming only denial: "Acting jointly with SLF Providers, including the Eden Defendants, to deny housing and services to Plaintiffs O'Connor and Mormino and the class based on disability or being 'regarded as' disabled").

Finally, the State Defendants cite a pair of cases in an effort to establish that Department of Housing and Urban Development ("HUD") regulations allow SLFs to exclude one class of disabilities without targeting another. Both cases turn on whether the FHA implicitly repealed § 202 of the National Housing Act of 1959 ("§ 202"), 12 U.S.C. § 1701q(a)(1) (1988). *See Beckert v. Our Lady of Angels Apartments, Inc.,* 192 F.3d 601, 604–07 (6th Cir. 1999); *Brecker v. Queens B'nai B'rith Hous. Dev. Fund,* 798 F.2d 52, 56–57 (2d Cir. 1986). HUD interpreted § 202 to allow a property owner under a Section 8 program to "apply to sponsor housing for a particular 'anticipated occupancy (elderly and/or handicapped [physically handicapped or developmentally disabled ...])" by specifying the subclass or subclasses of eligible tenants that it wishes to serve." *Brecker*, 798 F.2d at 56–57 (quoting 24 C.F.R. § 885.210(a)(5) (as amended 1982)) (alterations in original). As already explained, the court deals here only with a request for forward-looking relief, and unlike the HUD regulation interpreting § 202, the regulations governing the home and community-based waiver program incorporate anti-discrimination laws regarding eligibility criteria. *See* 42 C.F.R. § 441.301 (West 2017). An unpublished Second Circuit case the State Defendants cite suggests that the FHA applied to a person with a disability who wished to remain

in a homeless shelter, though that case turned on the fact that state officials determined that the plaintiff would have been "a threat to the health or safety of other individuals" due to his mental illness. *Jenkins v. N.Y.C. Dep't of Homeless Servs*, 391 F. App'x 81, 83 (2d Cir. 2010). Given the statutory and regulatory differences just discussed, these cases do not alter the court's conclusion that Plaintiffs adequately plead FHA claims against the State Defendants.

## VI. CONCLUSION

For the reasons stated, the State Defendants' motions to dismiss plaintiffs' claims are denied. The State Defendants' motion to dismiss Tabor Hills' crossclaim is granted. Orders will issue separately in each case.


Dated: September 29, 2017                    _____/s/_____
                                             Joan B. Gottschall
                                             United States District Judge